Good morning, everyone. All right, I'll be calling the cases in the order that they're listed on the argument calendar this morning. I'll try to help you out with regard to the clock, but please keep an eye on it yourself as well, and let me know in advance if you're hoping to reserve some time for rebuttal. So the first case, Loringer v. Kitchakazi, has been submitted on the briefs and record. So the first case up for argument this morning is U.S. v. Lingenbach. May I please the court, counsel? My name is Stephen Babcock. I represent the appellant in this case, Tyson Lingelbach. I would like to reserve two minutes on rebuttal, please. All right. The facts on this case are pretty straightforward. There is a noise complaint in Billings, Montana, and an officer shows up on the scene. And the noise complaint, there was no noise at the time. Officer Hilde, when he arrived on the scene, didn't even activate his overhead lights. He walked up to the vehicle, he saw Tyson Lingelbach in the driver's seat of a pickup, and he saw two firearms. Boom, everything changed. Mr. Lingelbach was removed from the vehicle, he was padded down, he was handcuffed, and he was placed in the back of a patrol car. About eight minutes after that, there was a search of his vehicle. The search of his vehicle at that point, the law enforcement officer took a shotgun out of the vehicle, and at that time there was determination that the shotgun had a shortened barrel. Now, the officer says that at the time he did that, he had decided that although there were warrants, they weren't going to incarcerate him, so they weren't going to arrest him, so they were going to put him back in the truck. Now, that, I don't think, appears, that decision juncture, I don't think, appears on the dash cam. Is that right? No, Your Honor. Later, there was a decision, after they knew it was a sawed-off shotgun, that they were not going to arrest him, and that decision juncture is on the dash cam. Correct. There was never any determination that they were going to arrest him at the time. He did have active warrants at the time, but the record is very clear that he was not arrested. I think it was because of jail overcrowding, so he wasn't arrested at that time. But what I'm trying to clarify is whether there was, whether at the time they went into the car to look for the shotgun, not to look at, to deactivate or neutralize the gun, they knew they were going to put him back, that he was going to be back in that truck. I don't think that the audio tape supports that. There was still an investigation at that time. Law enforcement officers were talking with dispatch. Essentially, they were investigating on whether or not he was a prohibited person at that time. So the time that the protective search was done by law enforcement officers, I believe the audio and the video clearly shows there was no determination at that point that they were going to release him or they were going to arrest him. So if they hadn't decided one way or the other, then from their point of view, it was possible that he was going to end up being released and getting back into the car, right? I think there was a possibility, yes, and that's eventually what they decided. So then why isn't this a straightforward application of Michigan against Long? You have somebody who might be in a position to get back into the car and would then have access to weapons, and so you want to search the car to protect the officers from the threat that might be posed if he got back into the car and had weapons there. And I would support that Michigan versus Long, in this opinion, is on our side because in Michigan versus Long, there was a determination as Long states that the suspect was dangerous. In Michigan versus Long, he was driving at excessive speed, he went into a ditch, he was uncooperative with law enforcement officers, and he was intoxicated. None of those facts are prevalent in this case. In Michigan versus Long, obviously it flows from Terry, and in Terry it specifically states that each case will have to be supported on its own facts. The district court in this case never made a determination that Tyson Lingelbach was dangerous. It was the mere possession of a firearm that made him dangerous. We know that possession of a firearm is certainly legal, and if we take a look in this particular case, there is nothing that the district court used to make a determination that Mr. Lingelbach was dangerous. The mere presence of a firearm was enough. It wasn't, I mean, maybe that's right as a description of what the district court said, but when we look at the record, it's not just the presence of the firearm, right, because the officer said, I think this is at ER 56, in his testimony, that when he asked Mr. Lingelbach to exit, to get out of the car and not touch the firearm, quote, he made some type of movement or motion towards where the firearm was located that the officer was concerned about. So, isn't, I mean, Terry and Long don't require a very high level of suspicion. Isn't that enough? They require some, and there's zero in this case. Well, by the way, I mean, what I just described is something, right, that when he's told to get out of the car, it looks like he is maybe trying to grab the firearm. That's something that a reasonable officer would be concerned about, isn't it? Well, the testimony that was established during the motion to suppress and relying upon that testimony, the district court specifically stated it was a nondescript movement. So, as flushed out in the hearing on the motion to suppress, that's not anything the district court relied upon. And once again, there was no finding that Mr. Lingelbach was dangerous. Once again, it's if you exercise your Second Amendment right in this particular case, you're apparently waiving your fourth. And that's been our argument the entire time. And if you're talking about immediate access to a firearm, what's wrong with a lawful individual possessing a firearm, having immediate access to his guns? That's why there needs to be a finding of dangerousness. And that's not also supported in the other case relied upon in the district court, and that's Orman. And that case is entirely different than this case. That's an individual that was possessing a firearm in a crowded mall, and that flows directly from Terry where you have a search of a person. The officer's safety in this case was satisfied by Mr. Lingelbach being removed from the vehicle, padded down, and handcuffed and placed in the back of the patrol car. I mean, I believe that the— I have a question about— Yes. You're not contesting this, but why did they get to do that? They weren't investigating him. I mean, they said that if he didn't have a firearm, he just would have gone out of his way. So what were they even detaining him for? Well, maybe that should have been challenged. But I will say that if there is the prong of Terry for officer safety, which we all know exists, that was satisfied by the padding down and the handcuffed and placed in the back of the patrol vehicle. But that's why the all-important question is, at the time, to me—well, there are two questions. At the time they searched the car, was he going to be back in that car? You know, even instantaneously before taking off so that he could have gotten to the gun while they were still there? And if that were so, is that sufficient? I guess there are three questions. I would argue— Is that a sufficient reason? Go ahead. You would argue what? I would argue definitely not. There needs to be— But the testimony of the officer was specifically that they made a decision before they searched the car that they were not going to arrest him in the warrants and they were going to let him go. Correct. So I agree with you that that's not supported in the dash cam. It's not unsupported either. There's no discussion of it that you can hear in the dash cam. But she says that somebody made that decision before they searched the car. Now, if that were true, does that matter? You're going to have to repeat your question. I'm sorry. I could not hear you. I apologize. I'm sorry you couldn't hear me. The—she—I mean, he, the person who—the officer who testified said that they made a decision or he made a decision before he searched the car that Lingelback was not going to be arrested on the warrants and that he was going to be let go, and that's why they searched the car. Now, we kind of know that isn't why they searched the car because he kept saying because it's in plain view and the plain view wasn't going to accomplish anything. It wasn't—didn't get you anywhere. But that was the testimony anyway. If that were so, would that be a sufficient basis for the search? No, I would argue not because as long as specifically stated that law enforcement has to have specific and articulable facts believing that the suspect is dangerous and the suspect may gain immediate access to the firearms. Once again, what's the problem with an individual that is not deemed dangerous, that is legally in possession of a firearm going back to his vehicle? The officer safety component of Terry is triggered if there is law enforcement belief that an individual is dangerous. That's specifically stated in Long. It's specifically stated in Van Groen, which is an unpublished decision from this case, which specifically stated in that case the suspect was uncooperative. Zero reasonable suspicion that he was dangerous in this case. So if I may reserve the rest of my time.  All right. Let's hear from the government. May it please the Court, Julie Patton appearing on behalf of the United States. This is a straightforward application of Long. The standard from Long is whether a reasonably prudent man in those circumstances would be warranted in the belief that his safety or the safety of others is at risk here. Okay. But at the time they did the search, Lingelback was handcuffed in the back of the police car. Yes. But he was going to be released from that stop. All right. So I go back to my question, that the decision that he was going to be released from that stop with regard to the sawed-off shotgun was not made until, obviously, after the sawed-off shotgun was found. So is the basis for the conclusion that he was going to be released this testimony by the officer that he had made that decision, which I don't think appears on the dash cam. There's no discussion on the dash cam before the search that he's going to be released. Is that correct? There does not appear to be any discussion on the dash cam. But the officer did testify that he'd run these warrants, determined that due to jail overcrowding, he was not going to be able to arrest Mr. Lingelback on these warrants, and ultimately he would be released back into that environment where the firearm was located. But we also know that what he was actually saying the whole time, he seems to be very careful, except he had his doctrine wrong, because he kept saying, well, I'm comfortable with this because it's in plain view, and that wasn't going to do it because what was in plain view was as far as I could tell a legal firearm. So the actual reason he took it was because he thought he could do it because it was in plain view. Now, does it make any difference that those pieces don't seem to connect up very well? I don't think that it does. I don't think that it matters that he says this on the dash cam because he testified that his concern was obviously for his safety, that he was going to go in and make the firearm safe. He was going to just protect himself and others. Because in this situation, the facts here are that it's 2 a.m. He's come across a man who's just sitting in his vehicle at 2 a.m. with a shotgun or firearm directly next to his leg. He then says that he was... Counsel, your colleague on the other side argues that the district court didn't make any specific findings of dangerousness in this case, and so the argument essentially is going down the path of, well, just because somebody has a firearm, it doesn't necessarily establish dangerousness. The district court did make certain findings. So were those findings adequate? Yes, because I agree with what Judge Miller said. It's not a very high bar, and she did recognize that a firearm increases the dangerousness of a traffic stop. Traffic stop is inherently dangerous for officers. Add in a firearm and it increases the dangerousness. She also discussed the time of night. The trouble is there's... Well, go ahead. Finish. Go ahead. Well, I mean, she said more than that. It was the time of night. It was the officer being startled, presumably because he was reaching for the firearm, and the officer said, no, don't reach for anything, and the fact that he was going to be released into an environment where he would have had immediate access to the firearm. Correct. Those are the findings that the court made. And I think that is sufficient, that he was going to be released into this environment where a firearm could be unexpectedly and fatally used against him. That is what Terry concerns itself with, and that's what Long concerns itself with as officer safety, and this would have been a minimal intrusion in that he was just going to remove the ammunition from this firearm. Only when he does that does he realize it's an illegal firearm, and that's when it's seized. So is it your view that any time there's a traffic stop and the driver isn't going to be arrested, if the officer determines that there's a firearm in the vehicle, under Long the officer can search the firearm and make sure it's unloaded? The government isn't advocating for a per se rule that any time there's a traffic stop and a firearm is seen, that that justifies a protective sweep. That's not the standard from Long. It's whether a reasonably prudent officer in that situation under those circumstances would fear for his safety. And so... But I guess because when you've been asked about that a couple times, like you say he would fear for his safety because there was a firearm there, so it does seem like you're getting close to something like a categorical rule. Perhaps, but I think there's also a circumstance such as a hunter with a rifle in a gun rack, and an officer may not fear for his safety. But, yes, I think when there is a firearm in a traffic stop, especially in this situation with these facts at 2 a.m., and with an individual who's made it, while the court may have said nondescript, he made a motion towards it that did startle the officer. Those things taken together... Well, did he even say he made a motion towards it? He just said he made a motion. He was removing something. He was moving. Correct, because I believe that, one, the officer testified that he thought it was a movement at least towards it, or he called it a nondescript, and Mr. Lingelbach testified that he was just removing things from his lap. But either way, you can hear on that dash cam video, it startles the officer. He says, I don't like how you're reaching around there. Traffic stops are just fraught with danger for an officer approaching a car. When you add in a firearm, that increases that. But the problem, of course, is that letting people drive around with guns next to them is fraught with danger, not just for the police officer but for everybody else. But we're allowing that. That's the problem. We have sort of a disconnect between gun rights and officer safety. And the question is, the officer here seemed to be articulating, essentially, a per se rule. He said, whenever I see a gun, this is what I do. And that may be understandable, but it doesn't mean, as Judge Miller said, that any time somebody in Montana is driving around with a rifle next to him, that the gun gets seized. I don't think that's what the officer testified to. I think what he talked about his training was that when he's dealing with a traffic stop, he comes up to the vehicle, he scans for weapons because exactly a weapon could be used against him. It's dangerous. And he then takes them out of the vehicle, separates them from the vehicle, and then takes extra steps to protect himself. Only when he knew that the lingelbach was going to be able to return to his vehicle did he make the decision that he needed to make the firearm safe. But that means that every time there is somebody in a vehicle with a firearm, the firearm is going to be searched. I disagree. I think it is fact-dependent. We know that from tariots, that we have to look at the facts. But I'm saying that what the officer took from this was that every time there is a firearm in a vehicle that he sees, when he stops somebody, he not only separates the person from the firearm, but before he lets somebody back in, he searches the vehicle. I don't know that that's what the officer thinks, but I don't think that that was the case. I think here we're dealing with someone who not only does he have a firearm in his vehicle, it's 2 a.m. He said he's been in his vehicle because he's fighting with his old lady. He has warrants for his arrest. They're dealing with a license plate issue while this is ongoing. That's why it takes some time. And they found out that he was right? I'm sorry. They found out that his story was true? Correct. And they found out he wasn't a felon? Correct. And they found out that his warrants were minor? And when they got there, and the investigation was for noise, and when they got there, there wasn't any noise. So they had really nothing. I mean, I don't understand what the detention was for because they had nothing to detain him for, but that's a different question. I guess no one's arguing that. Right. I think if we were able to ferret that out at a hearing, if it had been raised, that would matter here. But it's not reasonable suspicion that he may be armed and may be dangerous. Well, we know he's armed. So is there reasonable suspicion that he's dangerous? I would argue yes. The movement towards it, the discussion that he's maybe been in a domestic disturbance with his significant other, those things are – it's not a very high bar, but at that point, I think there is some concern that if he's allowed back in that vehicle, he could gain access to that firearm. And that's what Long permits. Let me ask you one last question. Suppose there was a timing problem here. You're not specifically arguing inevitable discovery in the sense that – just to spin out what I'm thinking. Even if they are precipitous in searching the vehicle because we really don't have any evidence that they were going to let him back in that vehicle earlier, we do know later that there was a whole discussion about whether to let him back in the vehicle and they were going to let him back in the vehicle. So at that point, presumably, on this theory, if your theory is right, they could have searched the vehicle even if they couldn't have earlier. I mean, it's disturbing that at the time they searched the vehicle, he was in the back of a police car handcuffed and not dangerous to anybody. So it doesn't matter that later, as things evolved, he was going to be allowed into the vehicle. I think at that point that they decided to make the firearms safe, they knew he was going to be. But I think at any point – Where do we get that from? That's the part that's – From the officer's testimony. She says that, but, I mean, there are two completely – two facts that seem to contradict that. One is the fact that she was – when she was being – I keep saying she. That he was being articulate about why he was doing it and he seemed to be very careful, but he was, as I say, careful on the wrong doctrine. So he was doing it because he thought he had plain view rights. So he wasn't doing it because he was concerned about officer safety at that point. We know that because he said what he was doing. And second of all, although he says that they knew they were going to release him, there's nothing in the dash cam recording that supports that. But there is something in the dash cameras recording that later supports that they were going to let him back. They knew, I guess, he was going to be released back to this vehicle, and that's where Michigan Belong applies here because he could have gained immediate access to that weapon. The timing doesn't matter. The fact that they didn't know that until – if we concluded that they didn't actually know that until later, it wouldn't make a difference. Is that what you're saying? And I'm saying maybe you have an inevitable discovery argument that would support that, but you don't actually make that argument. No, I do not make that argument, and I don't know that we do have an inevitable discovery argument because it would happen later, but I think either way he was released from this traffic stop, and they did – the intrusion that they made was just to basically – for officer safety. Whether the officer knew that at the time or kept saying plain view in the dash cam, he did testify that he was fearful for – at least he made that decision because of the safety of himself and for others. All right. Thank you very much for your argument, counsel. Thank you. Mr. Babcock, Roberto. Thank you. Forty years ago in Michigan v. Long in the dissent, Justice Brennan said that the implications of the court's ruling are frightening. But at least in Long there was determination that the individual was dangerous. In this particular case, I would argue that the mere presence of a firearm, as advocated by the government, as stated by the district court, allows a law enforcement officer to search a vehicle. And Long talked about a hunting knife. Where are we at now that a construction worker gets pulled over, he's got a hammer in his vehicle, so he can now search the compartment of a vehicle? Or you have a baseball coach, he's got a baseball bat in the vehicle. That could be used as a weapon. We pull you over for speeding, we take you out, we can now search the vehicle. That is what I believe Justice Brennan was talking about 40 years ago, the implications and how they're frightening in this particular case. And if we're talking about what the district court decided here, what do we have, late at night? I mean, I think we can all state that the Fourth Amendment doesn't go away when the sun goes down. So clearly in this particular case, I don't believe there's any finding that Tyson Lengelbach was dangerous. Therefore, all fears for officer safety should have been alleviated. He should have been allowed to go back to that vehicle, and they should not have been able to do a protective search of the vehicle. Thank you. Thank you very much, counsel, both sides for your argument. The matter is submitted for decision by this court.
judges: BERZON, NGUYEN, MILLER